**TYCO INDUSTRIES, INC., Plaintiff,**

v.

**TINY LOVE, LTD. and The Maya Group, Inc., Defendants.**

**TINY LOVE, LTD., Plaintiff on the Counterclaims,**

v.

**TYCO INDUSTRIES, INC., Defendant on the Counterclaims.**

**Civ. No. 95–1135 (HAA).**

United States District Court, D. New Jersey.

Jan. 23, 1996.

Singer & Goger, Newark, N.J., Susan S. Singer, Panitch Schwarze Jacobs & Nadel, P.C., Philadelphia, Pa., Roberta Jacobs–Meadway, for Plaintiff/Counterclaim Defendant.

Hartman, Winnicki & Finnerty, P.C., Paramus, N.J., Warren S. Robbins, Ostrolenk, Faber, Gerb & Soffen, LLP, New York City, Robert C. Faber, Douglas A. Miro, for Defendants/Counterclaim Plaintiff.

## OPINION

HAROLD A. ACKERMAN, District Judge.

On March 7, 1995, plaintiff, Tyco Industries, Inc. ("Tyco"), initiated this action by filing a complaint seeking declaratory relief against the defendants, Tiny Love, Ltd. ("Tiny Love") and The Maya Group, Inc. ("Maya") (collectively "Tiny Love" or "defendants"). More specifically, Tyco is seeking a judgment declaring that it is not infringing any rights Tiny Love may have in the design and appearance of the Tiny Love activity gym, which is marketed under the name the GYMINI 3–D Activity Gym ("GYMINI Gym"), under the trademark laws of the United States or New Jersey or under common law, or under the patent laws of the United States.

Maya filed its answer on April 19, 1995. Thereafter, on May 9, 1995, Tiny Love filed its answer and also asserted four counterclaims against Tyco. Tiny Love asserts claims for trademark infringement pursuant to section 43(a) of the Lanham Act (*see* 15 U.S.C.A. § 1125(a)), unfair competition pursuant to New Jersey law (*see* N.J.S.A. 56:4–1 *et seq.*), unfair business practices and deceptive trade practices pursuant to the New Jersey Unfair Business Practices Act (*see* N.J.S.A. 56:8–1 *et seq.*), and various other claims based on the common law of New Jersey.

This matter now comes before the court upon the application of Tiny Love and Maya for a preliminary injunction enjoining Tyco from manufacturing, promoting, distributing, importing, shipping and/or selling its children's activity gym marketed under the trade name Sesame Street Cozy Quilt Gym ("Cozy Quilt"). In addition, Tiny Love and Maya seek an order requiring Tyco to recall from its customers any such activity gyms which it has sold or previously shipped.

For the following reasons, defendants' application is denied.

## I. Standard for Preliminary Injunction

In ruling on an application for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, a district court must consider (1) the likelihood that the moving party will prevail on the merits; (2) the extent to which the moving party will be irreparably harmed by the denial of such relief; (3) the extent to which the party defending against the motion will suffer irreparable harm if the preliminary injunction issued; and (4) whether granting preliminary relief will be in the public interest. *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994) (citing *Merchant & Evans, Inc. v. Roosevelt Building Products Company, Inc.*, 963 F.2d 628, 632 (3d Cir.1992) (citations omitted)). The injunction should issue only if the moving party produces evidence sufficient to support a finding that all four factors favor preliminary relief. *Id. Accord S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 374 (3d Cir.1992); *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990).

Between October 2 and 10, 1995, this court held an evidentiary hearing on defendants' application for a preliminary injunction. The following constitutes my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. Findings of Fact

### A. The Parties

Tiny Love is an Israeli corporation based in Tel Aviv that is in the business of develop-

ing a line of baby products. Tiny Love's products include the GYMINI Gym, a nightlight clock, and a line of plush toys called "Heavenly Bunnies." Maya is a California corporation, based in Huntington Beach, and is in the business of marketing and distributing baby products. Maya is the exclusive distributor of Tiny Love products in the United States.

Tyco is a Delaware corporation and has its principal place of business in Mount Laurel, New Jersey. Tyco manufactures, distributes, and sells preschool and other children's toy products and games. Tyco manufacturers, distributes and sells infant toys through its Tyco Preschool division. Unlike Tiny Love and Maya, which are relatively small companies, Tyco is a market leader in the field of preschool toy products.

### B. Tiny Love's GYMINI Gym and Design Patent

Isaac Oren, who is the president of Tiny Love, invented the GYMINI Gym. The GYMINI Gym is made up of two flexible rods that are wrapped with stuffing and fabric, a blanket, and some hanging toys. The fabric-covered rods are bent to form two arches that go diagonally across the blanket and intersect above the center of the blanket. The arches are inserted into pockets at the corners of the blankets and there are snaps in the pockets in order to affix the arches to the blanket. Where the arches meet above the center of the blanket, there is a snap with which the two arches are connected so that they will stand up. The stuffing and fabric covering is not tightly wrapped around the flexible rods. This is necessary so that grommets can be placed through the stuffing and fabric. Each arch has eight grommets— one near the bottom of each arch and six towards the apex of the arches. Toys are hung from the arches through the grommets. The arches are red and the blanket has pictures on it.

The GYMINI Gym is used by placing the baby on the blanket on his or her back so that the baby can look up at the toys that are hanging from the arches. Because the rods had to be bent to form the arches, they provide the tension necessary to keep the blanket flat and to prevent the blanket from bunching up. This is important because if a baby is lying on the blanket and it bunches up, there is a possibility that the baby might suffocate. The design also provides for easy portability. This is achieved by rotating the arches so that they are lined up side-by-side. This results in the blanket being folded in half. The sides of the blanket can then be snapped together so that the blanket remains folded in half underneath the side-by-side arches. When in this position, the arches form a handle that is useful in carrying the GYMINI Gym.

As stated previously, Maya is the exclusive distributor of Tiny Love products in the United States. Maya began distributing the GYMINI Gym for Tiny Love in the United States, on a nationwide scale, in October of 1993, and it accounts for 80% of Maya's business. The GYMINI Gym is sold in catalogs, retail chains, specialty stores, and department stores. The stores that it has been sold in include Price–Costco, Burlington Coat Factory, Baby Super Store, F.A.O. Schwartz, and Nordstrom's. The catalogs include Imaginarium, One Step, Constructive Playthings, The Baby Catalog of America, The Paragon, and Sensational Beginnings. The GYMINI Gym has also appeared in magazines such as *Small World* and *Juvenile Merchandising*.

As of the date of the evidentiary hearing, Maya has spent approximately $50,000 in trade advertising. $40,000 of this amount was spent with respect to the GYMINI Gym. Also, Maya, for the most part, relies on the appearance of the product in catalogs to reach consumers. Maya has spent only approximately $300 on direct consumer advertising. Maya also promotes the GYMINI Gym at trade shows. For example, Maya promoted it at the New York Toy Fair in 1994 and 1995, and also at a trade show in Dallas in 1993 and 1994.

Since Maya began distributing the GYMINI Gym in the United States in October of 1993, Maya has sold approximately 120,000 GYMINI Gyms. Tr. at 514. Of the 120,000 units, 52,000 units were sold in 1994, 34,000 units were sold between January and June 1995, and 34,000 units were sold between

July and September of 1995. This amounts to sales of approximately $2 million in GYMINI Gyms. This sales figure is comprised of approximately $900,000 in sales for 1994, approximately $1,000,000 in sales for the first nine months of 1995, and limited sales in 1993. These sales might have been greater if Tiny Love had packaged the GYMINI Gym in a box. Tiny Love packaged it in a clear plastic bag that featured a cardboard insert that illustrates and describes the product. Maya offered the product to Caldor and Toys–R–Us. Both stores refused to buy the product because it was not packaged in a box. Mass retailers wanted the product in a box so that it could be stacked on shelves. As of the time of the hearing, Tiny Love had developed a box packaging, but it had yet to begin selling the product in a box.

The GYMINI Gym has won a number of awards. For example, the November 1994 issue of *Parenting* magazine recognized the GYMINI Gym as one of its "Toys of the Year." The criteria for this award were "safety, durability, and versatility" and "whether [the toy] encourages developmental skills." Defendant's Ex. 5. The GYMINI Gym has also been awarded the Oppenheim Toy Portfolio's Gold Seal Award and was scheduled to receive the Parent Choice Silver Award. There is no evidence in the record regarding the criteria for these awards.

On February 7, 1994, Tiny Love filed a design patent application in the United States Patent and Trademark Office ("PTO"). The PTO issued Design Patent Des. 359,869 (the "Tiny Love Patent") to Tiny Love on July 4, 1995. The patent claim is for "[t]he ornamental design for a baby's mattress" as depicted in a number of drawings. *See* Defendant's Ex. 12. Tiny Love argues that the GYMINI Gym is the commercial embodiment of the design claimed in the patent. While there are some differences between the GYMINI Gym and the drawings in the patent, they are substantially similar. Like the GYMINI Gym, the patent drawings depict a blanket connected to fabric-covered, crisscrossing arches. Furthermore, the arches are connected to the corners of the blanket via pockets. The main differences between the design claimed in the patent and the actual GYMINI Gym are that the patent drawing includes more grommets and snaps than does the GYMINI Gym, and also, the patent does not depict any hanging toys. However, for the most part the GYMINI Gym is the commercial embodiment of the Tiny Love Patent.

### C. Tyco's Sesame Street Cozy Quilt Gym

The defendants allege that Tyco's Cozy Quilt infringes the Tiny Love Patent and the GYMINI Gym trade dress. The Cozy Quilt is without question similar to the GYMINI Gym. Like the GYMINI Gym, the Cozy Quilt is made up of overlapping arches that are connected to a blanket base. The arches provide the tension necessary to keep the blanket flat. Also like the GYMINI Gym, the toys are hung from the Cozy Quilt's overlapping arches. Thus, the Cozy Quilt functions in exactly the same manner as the GYMINI Gym—they are both used by placing the baby on the blanket on his or her back so that the baby can look up at the toys that are hanging from the arches.

There are, however, a number of differences between the two products. First, the Cozy Quilt does not have any grommets on its arches. Rather, the toys are hung from loops made out of fabric. Tyco did not use grommets for safety reasons. According to Tyco, grommets are undesirable since they may have sharp edges and can separate from a product and be swallowed by babies.

Second, the appearance of the arches of the two products is dissimilar. As stated previously, in the GYMINI Gym, the stuffing and fabric is not tightly rapped around the rods that make up the arches. This allows the fabric to hang down from the rods so that the grommets could be put through the fabric and stuffing. The result of this is that the GYMINI Gym arches have a soft, fluffy appearance. Also, rather than having a cylindrical appearance, the GYMINI Gym arches have a somewhat flat or oblong appearance. On the other hand, the Cozy Quilt arches are formed by inserting a flexible rod into a shaft formed by extruded foam, then slipping a cover over the rod-foam combination. This method was used by Tyco because it is less labor intensive than the method

employed by Tiny Love, and the extruded foam is less likely to allow a broken rod to protrude through. Significantly, this method results in the Cozy Quilt arches having a different appearance from the GYMINI Gym arches. Unlike the fluffy, soft-looking, somewhat flat or oblong GYMINI Gym arches, the Cozy Quilt arches have a sleek, cylindrical appearance.

Third, the Cozy Quilt arches are attached to the blanket in a different manner than the GYMINI Gym arches. Rather than using pockets and snaps like the GYMINI Gym, the Cozy Quilt uses plastic hooks to attach the arches to the blanket. The GYMINI Gym's use of the pockets results in there appearing to be a more seamless connection between the arches and the blanket than is the case with the Cozy Quilt's use of the plastic hooks.

Fourth, unlike the GYMINI Gym, the Cozy Quilt does not have snaps on the periphery of the blanket. The snaps on the GYMINI Gym are used to keep the product in the folded, portable position. Rather than using snaps, the Cozy Quilt uses plastic clips to keep it in the folded position.

Fifth, the Cozy Quilt is different from the GYMINI Gym in that the Cozy Quilt takes advantage of a licensing agreement Tyco has with Sesame Street. The pictures on the Cozy Quilt blanket, the hanging toys, and the packaging all feature Sesame Street characters. This is important because if comparable products differ only in the use of a popular licensed theme, the product with the popular licensed theme, is more appealing and produces more sales.

Significantly, the differences described above are equally valid descriptions of the differences between the Cozy Quilt and the Tiny Love Patent. The patent drawings depict the use of grommets; fluffy, soft-looking, somewhat flat or oblong arches; the use of pockets to connect the arches to the blanket; and snaps on the periphery of the blanket. None of these features are present in the Cozy Quilt. The Sesame Street license is irrelevant to the design patent issue.

Given the manner in which Tyco developed the Cozy Quilt it is no surprise that the two products have a number of similarities. Prior to 1993, Tyco already had two baby gyms on the market. In 1988, it introduced what it refers to as its basic gym and in 1989, it introduced a musical gym. The Tyco basic gym has produced sales between $40 and $50 million since its introduction and is still on the market. The musical gym, however, experienced declining sales. As a result, in early 1994 Tyco began looking for a replacement. Mr. Stanley Clutton, Tyco Preschool's vice-president of marketing, testified that Tyco was "looking for an expensive, high-end gym to take [the musical gym's] place" that would sell at a retail price between $20 and $30. Tr. at 236, 239.

Prior to designing their new product, Tyco examined a number of competing baby gyms. One of the competing products that was examined was the GYMINI Gym, which Tyco became aware of in approximately January or February of 1994. Because Tyco was interested in "the idea of a soft gym" (Tr. at 264) and because the GYMINI Gym was such a gym, on March 24, 1994, Tyco sent a GYMINI Gym to Hong Kong in order to get an evaluation of how much it would cost to produce a product like this. See Plaintiff's Ex. 1. The design of the GYMINI Gym was to be the "starting point" for the design of Tyco's product. See id. Apparently, when toy companies are developing new products, it is not unusual for toy companies to evaluate the cost of potential competing products in this manner. In this case, however, the only product that Tyco sent for costing was the GYMINI Gym.[1] This evaluation resulted in the finding that it would cost too much to produce a baby gym like the GYMINI Gym and keep the retail price in the $20 to $30 range. Tr. at 270.

Also prior to designing its new product, Tyco conducted focus group research. The objective of the research was to have moth-

---

1. In connection with its development of the Cozy Quilt, Tyco did send some activity blankets to Hong Kong to be costed. This was done, however, only to evaluate the cost of several different methods of printing the fabric to be used on the product. See Tr. at 266–67. The images on the blankets are not an issue in this case.

ers look at a number of competing baby gyms, whose brand names were hidden, and tell Tyco which aspects of the products they liked and which they did not like. One of the products shown to the mothers was the GYMINI Gym, which Tyco renamed the Deluxe Gym for the purposes of the survey. The report, which was completed on April 27, 1994, concluded that the baby gym features that mothers found most appealing included safety, portability, softness, a sturdy structure, an attached blanket, detachable hanging toys, music, and mirrors on some of the toys. The report also concluded that mothers found all of these elements in the Deluxe Gym (a/k/a the GYMINI Gym) and that "[m]oms responded very positively to the Deluxe Baby Gym." Plaintiff's Ex. 2 at 216. Another element of the Deluxe Gym that the mothers who were surveyed liked was its "soft appearance." Plaintiff's Ex. 2A at 230. The GYMINI Gym was the product about which the mothers were most excited.

Tyco did explore a number of designs that did not as closely resemble the GYMINI Gym but that incorporated the results of the survey (i.e., a product that folded easily, was easily carried by the mother, and was self-erecting, soft and safe). *See, e.g.,* Plaintiff's Ex. 20, 21, 22. However, all of the alternative designs either did not function as well as a design that was based on overlapping arches connected to the corners of a blanket or were too costly to manufacture. Most of the alternative designs had both defects. Therefore, Tyco kept coming back to a design that featured two overlapping tension arches and an attached base.

The final design for the Cozy Quilt, which I described above, was completed in approximately September or October of 1994. Although Tyco showed the product to a couple of customers in approximately October or November of 1994, *see* Tr. at 375, Tyco did not begin manufacturing the Cozy Quilt until April 1995 and selling it until May 1995. As of September 27, 1995, Tyco had taken orders for approximately 72,000 Cozy Quilts from United States customers. The customers included, among other stores, J.C. Penney, Spiegel, Inc., Caldor, and Toys–R–Us. Toys–R–Us bought 46,000 of the 72,000 units

ordered. Tyco accomplished this without spending any money on consumer advertising and without spending as much as the $50,000 that Maya spent on trade advertising. Tr. at 373–74.

The defendants first became aware of the existence of Tyco's Cozy Quilt in early 1995 when Mr. Ided Ben–Ezer, who is Maya's vice president of marketing, saw Tyco's product in the February 1995 issue of *Juvenile Merchandising.* Mr. Ben–Ezer next encountered the Cozy Quilt at the February 1995 New York International Toy Fair. Tyco, like Maya, was exhibiting its product at the fair for promotional purposes. Mr. Ben–Ezer was informed by a potential customer that Maya "ha[s] competition." Tr. at 59. The potential customer had just come from the Tyco booth and was referring to the Cozy Quilt.

In letters dated February 15 and 17, 1995, Tiny Love's attorneys informed Tyco of Tiny Love's pending design patent application. Tiny Love's attorneys also demanded that Tyco immediately cease promoting, selling, and/or distributing the Cozy Quilt because, according to Tiny Love, the Cozy Quilt infringed on Tiny Love's design patent and trade dress rights. *See* Defendant's Exs. 21, 22. After receiving this information, Tyco did not redesign the Cozy Quilt because it does not believe that it is infringing any enforceable design patent or trade dress rights.

Then, as stated previously, on March 7, 1995, Tyco initiated this action by filing a complaint seeking declaratory relief against the Tiny Love Maya. Maya filed its answer on April 19, 1995. Thereafter, on May 9, 1995, Tiny Love filed its answer and also asserted four counterclaims against Tyco. Tiny Love and Maya then brought this application for a preliminary injunction enjoining Tyco from manufacturing, promoting, distributing, importing, shipping and/or selling its children's activity gym marketed under the trade name Sesame Street Cozy Quilt Gym. In addition, Tiny Love and Maya seek an order requiring Tyco to recall from its customers any such activity gyms which it has sold or previously shipped.

## III. Conclusions of Law

### A. Probability of Success on the Merits

First I will address the design patent claim, then I will address the trade dress claim.

#### 1. Design Patent

Tiny Love and Maya claim that Tyco's Cozy Quilt infringes the Tiny Love Design Patent Des. 359,869 (the "Tiny Love Patent"). Tyco argues that the Tiny Love Patent is invalid because it covers a primarily functional design and because the design is obvious. Tyco also argues that even if the patent could be construed as valid, the Cozy Quilt does not infringe the patent because it does not appropriate any point of novelty in the patent.[2]

■ Section 171 of the patent statute provides that designs patents may be issued to "whoever invents any new, original and ornamental design for an article of manufacture...." 35 U.S.C. § 171. Patents are presumed to be valid. 35 U.S.C. § 282. In addition, the patent statute squarely places the burden of proving facts establishing invalidity on the party who asserts invalidity. Id.; Jones v. Hardy, 727 F.2d 1524, 1528 (Fed.Cir.1984). The patent challenger must establish those facts by clear and convincing evidence. Avia Group International, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1562 (Fed.Cir.1988). The ultimate determination regarding validity is a conclusion of law based on those clearly and convincingly proven facts. With these standards in mind, I will address the issues of functionality, obviousness, and infringement.

#### i) Primarily Functional or Primarily Ornamental

■ A design patent is "directed at the appearance of an article of manufacture." L.A. Gear, Inc. v. Thom McAn Shoe Company, 988 F.2d 1117, 1123 (Fed.Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). It only "protects the nonfunctional aspects of an ornamental de-

sign as shown in the patent." Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir.1995) (citing Key Stone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1450 (Fed.Cir.1993)). Therefore, "if the patented design is 'primarily functional,' rather than primarily ornamental, the patent is invalid." Avia, 853 F.2d at 1563 (quoting Power Controls Corp. v. Hybrinetics, Inc., 806 F.2d 234, 238 (Fed.Cir.1986)). This is because the protection of a primarily functional design would not promote the decorative arts, which is one of the purposes of the patent statute. Id. (citing 1 D. Chisum, Patents § 1.04[2] at 1–194.1 to 1.195 (1986)).

■ "[T]he design of a useful article is deemed functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article." L.A. Gear, 988 F.2d at 1123. Furthermore,

[i]n determining whether a design is primarily ornamental the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article, in determining whether the claimed design is dictated by the utilitarian purpose of the article.

L.A. Gear, 988 F.2d at 1123 (citations omitted). See also Key Stone, 997 F.2d at 1450 ("[I]t is the appearance of a design as a whole which is controlling in determining questions of patentability and infringement.") (citations omitted). But see Power Controls, 806 F.2d at 240 ("In determining whether a design is primarily functional, the purposes of the particular elements of the design necessarily must be considered.").

■ Tiny Love argues that the claim in its design patent "comprises two soft looking overlapping arches attached at the ends of the arches to the corners of a square shaped blanket." Tiny Love Proposed Finding of Fact No. 59. See also Tiny Love Proposed Finding of Fact No. 67 (asserting that the point of novelty that Tyco misappropriated is "an activity gym including two soft looking,

---

**2.** Tyco also argues that Tiny Love is precluded from obtaining equitable relief because of its allegedly unclean hands before the PTO. See

Tyco Proposed Conclusions of Law Nos. 175–78. Because I am denying the application on other grounds I will not address these allegations.

overlapping arches and blanket base combination"). Therefore, the question is whether a design made up of two soft-looking, overlapping arches that are attached to the corners of a blanket base is primarily functional or primarily ornamental. Stated differently, the question is whether the utilitarian purpose of providing a soft base on which a baby could lie while looking up at hanging toys dictates such a design.

The blanket base clearly furthers the utilitarian purpose by providing a cushioned support surface for resting a baby, and also by receiving and anchoring the ends of the diagonal arches at the respective corner pockets. The corner pockets further this purpose by receiving the ends of the diagonal arches and keeping the ends of the arches secured to the blanket. The diagonal arches provide the structure from which the toys are hung. In addition, as discussed previously, because the flexible rods are bent to form the arches, the arches provide tension that keeps the blanket taut while the baby is lying on it. The arches crisscross in order to prevent them from falling down. The diagonal arches also rotate so that they can be folded together to provide for easy portability. The snaps on the periphery of the blanket are used to keep the blanket folded in half when it is placed in the portable position. Lastly, the grommets depicted in the patent are used to hang the toys. *See, e.g.,* Tr. at 448, 449, 466–70 (testimony of Denny Conley, Tyco's expert on toy design, wherein he testified regarding the functional aspects of the design claimed in the Tiny Love patent as embodied in the GYMINI Gym).

▆ Thus, it is clear that all of the components of the design further the utilitarian purpose. However, this conclusion does not end the inquiry. The fact that the design in the Tiny Love patent furthers the purpose of providing a baby mattress/activity gym does not necessarily mean that the Tiny Love design was dictated by primarily functional considerations. *See L.A. Gear,* 988 F.2d at 1123. "The elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent." *Id.* (citation omitted). If there are several ways to achieve the same

functions or utilitarian purpose as that achieved by the Tiny Love Patent, then it is "more likely" that the specific design claimed in the patent serves a primarily ornamental purpose. *See id.*

There is conflicting evidence before the court regarding whether there are alternative designs that would serve the same utilitarian purpose as the Tiny Love Patent. Tiny Love's expert in designing products for aesthetics, Michael Cousins, testified that there were a number of alternative designs that would perform the same functions. *See* Tr. at 122–29, 137–38; Defendants' Exs. 16–18, 20. Some of Mr. Cousins' alternative designs were quickly drawn during the hearing itself and some were prepared prior to the hearing. *See* Defendant's Exs. 16–18. With respect to the designs that Mr. Cousins created prior to the hearing, he stated that they were "certainly *not*" the result of "an extensive design project." Tr. at 137 (emphasis added). Mr. Cousins' office only spent "several hours" developing alternative designs. *Id.* Because Mr. Cousins admittedly did not engage in an extensive design project and appears to have only somewhat cursorily explored alternative designs, I find his testimony on this issue unpersuasive.

▆ Mr. Clutton, Tyco Preschool's vice-president of marketing, testified that Tyco also explored a number of alternative designs that performed the same functions. Tyco concluded from this research that the alternative designs did not function as well as a design that was based on overlapping arches connected to the corners of a blanket or were too costly to manufacture. Most of the alternative designs had both defects. *See* Tr. at 272–78; Plaintiff's Exs. 4, 20–22. Mr. Clutton explicitly and persuasively described the defects with the designs that appear in Plaintiff's Exs. 22–22. *Id.* Mr. Clutton testified that the "driving force" behind Tyco's using a design for the Cozy Quilt that incorporated overlapping arches attached to a blanket were that it functioned better and cost less than the alternative designs. Tr. at 278. In addition, Mr. Conley, who testified as Tyco's expert on toy design, also opined that none of the elements of the Tiny Love product could be replaced without

an impact on function, cost, or efficiency. Tr. at 449. I find Mr. Clutton's and Mr. Conley's testimony to be persuasive. Thus, I find that Tyco is likely to demonstrate by clear and convincing evidence that the design claimed by Tiny Love in its patent, i.e., two soft-looking, overlapping arches attached at the ends of the arches to the corners of a blanket, is primarily functional. Therefore, Tiny Love has failed to demonstrate that it is likely to succeed on the merits of its design patent infringement claim.[3]

### ii) Obviousness or Nonobviousness

In the alternative, I also conclude that Tiny Love has failed to establish a probability of success on the merits of its design patent claim because Tyco is likely to prove by clear and convincing evidence that the Tiny Love Patent is invalid because it is obvious.

A patented design must meet the substantive criteria of patentability, including nonobviousness in accordance with the law of 35 U.S.C. § 103. *See* 35 U.S.C. § 171 ("The provisions of this title relating to patents for inventions shall apply to patents for designs,

except as otherwise provided."). *See also Avia,* 853 F.2d at 1563 ("Design patents must meet a nonobvious requirement identical to that applicable to utility patents."). Section 103 of the patent statute provides, in part, that

[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

 "The ultimate legal conclusion of obviousness is a question of law." *Miles Laboratories, Inc. v. Shandon Inc.,* 997 F.2d 870, 877 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994) (citations omitted). *See also Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) ("the ultimate question of patent validity is one of law"). However, the analysis of obviousness rests

---

**3.** I note that, in their Proposed Findings of Fact and their responses to Tyco's Proposed Findings of Fact, the defendants often refer to their claimed design as including a soft appearance or looking soft. *See, e.g.,* Tiny Love Proposed Findings of Fact Nos. 18, 27, 67; Tiny Love Responses to Tyco Proposed Findings of Fact No. 157, 162. Therefore, the claim in the Tiny Love Patent might be construed as only encompassing the "soft appearance" of a baby gym that is made up of overlapping arches connected to a base. However, even if the claim were read this way Tiny Love would still have failed to establish a probability of success on the merits.

Let me first note that such a claim would not cover all such baby gyms that happened to be soft. Softness, particularly with respect to a baby product, is a functional aspect for which there is no alternative. Therefore, it is primarily functional and could not be claimed in a design patent.

Thus, the claim would only be for the soft *appearance* of the baby gym. If the claim in the Tiny Love patent is limited to a claim for soft appearance, then Tiny Love cannot establish probability of success on the merits because Tiny Love could not prove infringement. The test for infringement is as follows:

[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives,

two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1577 (Fed.Cir.1995) (quoting *Gorham Co. v. White,* 81 U.S. (14 Wall.) 511, 20 L.Ed. 731 (1871)). Furthermore, "[w]here ... a [patented] design is composed of functional as well as ornamental features, to prove infringement a patent owner must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental." *Id.* (quoting *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 825 (Fed.Cir.1992)). In addition, "the accused design must appropriate the novel ornamental features of the patented design that distinguish it from the prior art." *Id.*

Tiny Love would be unable to establish infringement pursuant to this test. As discussed in my findings of fact, the Cozy Quilt arches have a different appearance from the arches depicted in the Tiny Love patent and embodied in the GYMINI Gym. Unlike the fluffy, soft-looking, somewhat flat or oblong GYMINI Gym arches, the Cozy Quilt arches have a sleek, cylindrical appearance. Therefore, if the Tiny Love patent was construed as covering merely the soft appearance, Tyco cannot be liable for infringement because it did not appropriate such appearance.

on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art devices and the claimed invention; (3) the level of ordinary skill in the art; and (4) any other objective evidence of nonobviousness. *Miles Laboratories,* 997 F.2d at 877 (citing *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 694). When analyzing a design patent, obviousness is "reviewed from the viewpoint of a designer of ordinary skill or capability in the field to which the design pertains." *L.A. Gear,* 988 F.2d at 1124 (citing *In re Nalbandian,* 661 F.2d 1214, 1216 (CCPA 1981)). Furthermore, obviousness must be reviewed without the benefit of hindsight afforded by the disclosure in the patent. *Id.* Thus, "[w]hen the patented design is a combination of selected elements in the prior art, a holding of obviousness requires that there be some teaching or suggestion whereby it would have been obvious to a designer of ordinary skill in the art to make the particular selection and combination made by the patentee." *Id.* (citation omitted).

 First, the scope and content of the prior art must be determined. More specifically, when dealing with a design patent, the first step is to determine "whether there is 'a reference to something in existence, the design characteristics of which are basically the same as the claimed designed, in order to support a holding of obviousness.'" *Id.* (quoting *In re Rosen,* 673 F.2d 388, 391 (CCPA 1982)). Therefore, in addition to the individual elements of the design, the ornamental quality of the combination must be suggested in the prior art. *Id.*

 In this case, the most relevant prior art reference is the Sassy Play Tent. *See* Defendant's Ex. 19. Although the parties dispute the relevance of the Sassy Play Tent, they agree that it is in the prior art. It is also notable that the Sassy Play Tent was not before the PTO when the patent was issued. The Sassy Play Tent is more similar to the design in the Tiny Love Patent than any of the prior art references cited by PTO, which albeit included tents. *See* Tr. at 431–39; Plaintiff's Exs. 80–83. Where prior art that was not before the PTO is produced, the element of deference due the PTO is re-

duced. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). However, the production of new prior art does not shift nor lighten nor change the burden of proof that a party attacking the validity of a patent must meet. *Id.*

The Sassy Play Tent has many design characteristics that are similar to the design claimed in the Tiny Love Patent. Most significantly, like the Tiny Love Patent, the Sassy Play Tent has diagonal tension arches that are connected by pockets to the corners of a base. *See, e.g.,* Tr. at 136, 142, 422–23. The tension arches, pockets, and base perform the same functions in the Sassy Play Tent as they do in the Tiny Love Patent. *See* Tr. at 422–23. The main differences between the Sassy Play Tent and the patent are: (1) the arches on the tent are higher than on the patent; (2) unlike the patent design, the tent has mesh walls; (3) the connection between the arches and the base has a less seamless appearance on the tent as compared to the patent; and (4) unlike the patent design, the arches on the tent are not covered in stuffing and fabric and therefore do not have a soft-looking or fluffy appearance and do not have grommets. *See, e.g.,* Tr. at 423–26.

 Since this case involves a design patent, in determining whether the Sassy Play Tent renders the Tiny Love Patent obvious, "the focus must be on appearances and not uses." *In re Harvey,* 12 F.3d 1061, 1064 (Fed.Cir.1993). As stated previously, Tiny Love argues that the claim in its design patent "comprises two soft looking overlapping arches attached at the ends of the arches to the corners of a square shaped blanket." Tiny Love Proposed Finding of Fact No. 59. *See also* Tiny Love Proposed Finding of Fact No. 67 (asserting that the point of novelty that Tyco misappropriated is "an activity gym including two soft looking, overlapping arches and blanket base combination"). Thus, the question is whether, from the perspective of an ordinary designer in the art, the appearance of the Sassy Play Tent renders an ornamental design made up of "two soft looking overlapping arches at-

tached at the ends of the arches to the corners of a square shaped blanket" obvious.

Although Tiny Love's expert, Mr. Cousins, did testify that the Tiny Love Patent is not an obvious modification of the Sassy Play Tent, *see* Tr. at 136, a close analysis of his testimony reveals the significant similarity between the appearance of the tent and the patent. With respect to the appearance of the GYMINI Gym, which is the commercial embodiment of the Tiny Love Patent, Mr. Cousins and Tiny Love's counsel had the following colloquy:

Q: What's the significance of the fact the arch goes from corner to corner and the blanket is held by the end of the arches in terms of—

A: Well, the arches are holding the blanket there. But it's going from place to place. *It's kind of enclosing the form.* The arch is sort of saying—

Q: Would you amplify that enclosing the form comment?

A: I don't know, I guess from a design standpoint I think you're looking for a tension between this rectangle and those curves and trying to get them to go together nicely.

*You almost—this is creating a dome for the child to play inside. That's kind of an enclosure but in fact you can get in there. As I think we talked earlier, you can get in there to diaper them or reach in there to pick them up.*

It's very pleasing.

Tr. at 118–19 (emphasis added). Mr. Cousins further testified with respect to the GYMINI Gym:

Q: Does the object inside look like it's thoroughly enclosed?

A: One could look and say it's inside and outside. *There's an enclosure for the child but you can get at them, and they can get at you.*

Q: Aesthetically, it gives *the idea of enclosure* while aesthetically being completely open?

A: Yes, it does.

Tr. at 135–36 (emphasis added). Thus, Mr. Cousins testified that the Tiny Love Patent looks like an enclosed dome, but has the functional attribute of having no sides so that a mother can reach her baby.

With respect to the Sassy Play Tent, Mr. Cousins testified as follows:

Q: Does the Sassy tent appear to you to have the same design as the Gymini Gym Exhibit 2?

A: Well, no, it's a tent. *It has sides. Has walls. A lot of the description I gave earlier, how you could reach and feel the baby, doesn't seem to fit. It has sides . . . .*

Q: It makes *a complete total enclosure* around the article that's inside, whatever that is, isn't it?

A: Yes.

Tr. at 135 (emphasis added). Thus, according to Mr. Cousins, the Sassy Play Tent is distinguishable from the patent because it has walls. More importantly, Mr. Cousins' testimony can be fairly read as stating that the walls distinguish the tent from the patent because the walls inhibit a functional attribute of the patent, i.e., the ability to reach a baby that is lying on blanket. According to Mr. Cousins, the walls of the tent do not, however, distinguish the *appearance* of the Sassy Play Tent from the Tiny Love Patent. Mr. Cousins testified that both the tent and the patent were "enclosures" or gave the appearance of an "enclosure." Therefore, even though, due to the Sassy Play Tent's walls, the appearance of the Tiny Love Patent and the tent are not identical, because both items have diagonal arches connected to a base there appearances are extremely similar. In other words, the design characteristics of the Sassy Play Tent are "basically the same as the claimed designed." *See L.A. Gear,* 988 F.2d at 1124 (citation omitted).

The question still remains: From the perspective of an ordinary designer in the art, does the appearance of the Sassy Play Tent render an ornamental design made up of two soft-looking, overlapping arches attached at the ends of the arches to the a blanket base obvious? After considering the evidence in the record, particularly the above mentioned testimony of Mr. Cousins and Mr. Conley's testimony regarding the obviousness of the Tiny Love Patent, *see* Tr. at 427–30, I conclude that the Sassy Play Tent does render

the Tiny Love Patent obvious. As discussed above, the appearance of the two items is extremely similar. Furthermore, Mr. Conley persuasively testified, albeit not in these words, that the suggestion to get from the Sassy Play Tent to the Tiny Love Patent is provided by functional considerations. For example, in order to be able to reach the baby the walls would have to be taken off, something would have to be put over the rods that make up the arches so that toys can be hung from the arches, and the arches would have to be lowered so that the baby could touch the toys. *See* Tr. at 427–30. Therefore, I conclude that Tiny Love would not be likely to succeed on the merits of its design patent infringement claim, because Tyco is likely to demonstrate, by clear and convincing evidence, that the Tiny Love Patent is invalid due to obviousness.

■ Moreover, there is no objective evidence of nonobviousness in the record that detracts from this conclusion. Objective evidence of nonobviousness, such as commercial success, long felt need for the invention, copying, and failure of others to invent, is relevant, and when present, must be considered. *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1555 (Fed.Cir.1995) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir.1983)). However, while the presence of objective evidence would weigh in favor of nonobviousness, the lack of it does not weigh in favor of obviousness. *Miles Laboratories*, 997 F.2d at 878 (citing, *e.g., Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955 (Fed.Cir.1986)). When a patentee does offer objective evidence of nonobviousness, there must be a sufficient nexus between that evidence and the merits of the claimed invention. *In re Paulsen*, 30 F.3d 1475, 1482 (Fed.Cir.1994) (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988)).

■ Tiny Love asserts that the GYMINI Gym has had commercial success and that Tyco copied it, and therefore, there is objective evidence of nonobviousness in the record. The problem with Tiny Love's argument is that it has failed to establish the requisite nexus between any alleged commercial success and/or Tyco's alleged copying and the ornamental aspects of the claimed design. Since this is a design patent case, Tiny Love would have to prove that the commercial success and copying was due to the GYMINI Gym's appearance and not to any of its functional attributes. Tiny Love has not done this. Therefore, I find that there is no objective evidence of nonobviousness in the record.[4]

## 2. Trade Dress Infringement

Tiny Love is also moving to preliminarily enjoin Tyco from infringing its trade dress rights under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In response, Tyco argues that the defendants do not have any protectable trade dress rights.

■ Originally "trade dress" referred to the packaging or displays associated with trademarked goods. *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994). Trade dress protection, however, has been extended to the design of the product itself. *Id.*

> While it was once well-settled that shapes of products in the public domain may be freely copied, the same no longer holds true, as federal trade mark law under the Lanham Act may protect product configurations.

*Id.* (citations and internal quotation marks omitted). Moreover, "the Lanham Act protection of product configurations extends to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* at 1439.

■ In order for Tiny Love to prove that the configuration of the GYMINI Gym quali-

---

**4.** I also note that, as discussed in footnote 3, the Tiny Love Patent potentially could be limited to the design's "soft appearance." The soft appearance is arguably not invalid due to obviousness. However, also as discussed in footnote 3, if the patent were limited to merely the soft appearance, then Tiny Love would still be unable to demonstrate a likelihood success on the merits because Tyco's Cozy Quilt does not appropriate the soft appearance.

fies for trade dress protection under section 43(a), it must prove that: (1) the trade dress is either inherently distinctive OR distinctive by virtue of having acquired secondary meaning; (2) the trade dress is nonfunctional; and (3) Tyco's use of Tiny Love's trade dress is likely to cause consumer confusion. *Id. Accord Versa Products Company v. Bifold Company (Manufacturing) Ltd.,* 50 F.3d 189, 199 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995).

Tiny Love is unlikely to succeed on this claim for a number of reasons. First, Tiny Love is unlikely to be able to meet its burden of proving that the trade dress is nonfunctional. *See Merchant & Evans, Inc. v. Roosevelt Building Products Company, Inc.,* 963 F.2d 628, 634 (3d Cir.1992) (placing burden of proof on issue of functionality on the party seeking trade dress protection).

The "functionality" of a feature of a product or service cannot be determined by the application of a mechanical test. Although various forms of inquiry have been articulated, the essence of the question is whether a particular feature of a product is substantially related to its value as a product or service, i.e., if the feature is a part of the "function" served, or whether the primary value of a particular feature is the identification of the provider.... Several courts have noted that the key policy served by barring the use of functional features for identification is the policy favoring competition, and that the "functionality" inquiry must be addressed in light of this policy.

*Id.* (quoting *United States Golf Ass'n v. St. Andrews Systems,* 749 F.2d 1028, 1033–34 (3d Cir.1984)). Furthermore, product configurations are deemed functional where only a limited number of viable alternatives exist or where the product configuration is the best or one of a few superior designs. *Id.*

The functionality of the GYMINI Gym has already been discussed in detail above. I also previously found that the evidence in the record demonstrates that there are limited number of alternative designs to the GYMINI Gym and that the GYMINI Gym was the best of these alternatives. Furthermore, there is no evidence in the regard that indicates that the configuration of the GYMINI Gym serves as an identifier of the provider. For these reasons, Tiny Love cannot meet its burden on the issue of nonfunctionality and therefore, is not likely to succeed on its trade dress infringement claim.

Second, I briefly note that Tiny Love would also be unlikely to meet its burden of showing that the product configuration is either inherently distinctive or distinctive by virtue of having acquired secondary meaning. The Court of Appeals has stated that product configuration can be inherently distinctive in a certain set of circumstances that is

characterized by a high probability that a product configuration serves virtually exclusively identifying function for consumers.... In particular, we think that, to be inherently distinctive, a product configuration—comprising a product feature or some particular combination or arrangement of product features—for which Lanham Act protection is sought must be (i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely to serve primarily as a designator of origin of the product.

*Duraco,* 40 F.3d at 1448–49. The evidence in the record clearly is deficient with respect to this stringent test for inherent distinctiveness.

Tiny Love is also unlikely to be able to demonstrate that the GYMINI Gym configuration has acquired secondary meaning. Factors relevant to a finding of secondary meaning in a product configuration include:

(1) plaintiff's advertising expenditures, measured primarily with regard to those advertisements which highlight the supposedly distinctive identifying feature [citation omitted]; (2) consumer surveys linking the distinctive product configuration to a particular, single source (although the identity of the source need not be shown); and (3) the length and exclusivity of use.

*Duraco,* 40 F.3d at 1452. There is not sufficient evidence in the record to support a finding that Tiny Love is likely to be able to demonstrate that the GYMINI Gym configuration has acquired secondary meaning.

For these reasons, Tiny Love is not likely to succeed on the merits of its trade dress infringement claim.

### B. Irreparable Harm and the Public Interest

In deciding whether a preliminary injunction should issue the court must also consider i) the extent to which the moving party will be irreparably harmed by the denial of such relief; ii) the extent to which the party defending against the motion will suffer irreparable harm if the preliminary injunction issued; and iii) whether granting preliminary relief will be in the public interest. *See Duraco*, 40 F.3d at 1438.

 Although irreparable harm is presumed where there exists a strong showing of patent validity and infringement, *see H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987), *abrogated on other grounds, Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir. 1995), in this case there has been no such showing. Therefore, Tiny Love and Maya cannot rely on a presumption of irreparable harm. In addition, the evidence in the record does not support a finding that Tiny Love and Maya will be irreparably harmed if their application is denied. Tiny Love and Maya's per month unit sales of GYMINI Gyms have increased since Tyco began marketing its Cozy Quilt. In the first six months of 1995, Tiny Love and Maya averaged selling 5,666 units per month. However, for July through September of 1995, Tiny Love and Maya averaged 11,333 units of sales per month. The Cozy Quilt went on sale in May of 1995. Therefore, the Cozy Quilt clearly has not caused a decrease in sales of GYMINI Gyms. Moreover, there is evidence in the record that certain mass retailers would not purchase the GYMINI Gym because it was not packaged in a box. Thus, there is direct evidence in the record regarding why some stores would not purchase any GYMINI Gyms and it has nothing to do with Tyco's Cozy Quilt. In addition, the evidence in the case is somewhat speculative with respect to the issue of whether every sale of a Cozy Quilt is the equivalent of a lost sale of a GYMINI Gym. For these reasons, I find that Tiny Love and Maya have not demonstrated that they will be irreparably harmed by the denial of their application.

I also find that Tyco would be somewhat harmed by the issuance of the injunction, and therefore, the balance of the equities weighs slightly in favor of denying the application. I say slightly because Tyco is obviously a large company that would not be faced with financial ruin if it could not sell the Cozy Quilt. However, Tyco would be somewhat harmed in its business relationships with mass merchandisers. If Tyco had to remove this product, mass merchandisers such as Toys–R–Us would perceive Tyco as an unreliable business partner and might reduce the number of Tyco products that they would carry. Tr. at 384–85. Therefore, Tyco would be somewhat harmed by the issuance of the injunction, and thus, the balance of the equities weighs slightly in favor of denying the application.

 Lastly, a court must consider whether granting preliminary relief will be in the public interest. Admittedly, no public interest is served by allowing patent or trade dress infringement. *See Telebrands Direct Response Corporation v. Ovation Communications, Inc.*, 802 F.Supp. 1169, 1179 (D.N.J. 1992) (patent infringement). Tiny Love and Maya, however, have not demonstrated a likelihood of success on either their patent or trade dress infringement claims. Therefore, the public's interest in vigorous competition in the market place is served by denying the application. *Cf. Merchant & Evans*, 963 F.2d at 633 (stating that there is a there "is a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws.") (citation omitted); *Telebrands*, 802 F.Supp. at 1179 (stating that vigorous competition in the market place is favored).

### IV. Conclusion

Tiny Love and Maya have failed to demonstrate a likelihood of success on the merits of their claims. This is because, with respect to the patent infringement claim, Tyco is likely to succeed on its defenses of proving, by clear and convincing evidence, that the Tiny Love Patent is invalid because it is primarily

functional and obvious. With respect to the trade dress claim, Tiny Love and Maya are not likely to succeed on the merits because they have failed to demonstrate a likelihood of establishing that the GYMINI Gym's configuration is nonfunctional and either inherently distinctive or has secondary meaning. In addition, Tiny Love and Maya have not established that they will be irreparably harmed by the denial of their application for a preliminary injunction. On the other hand, Tyco would be slightly harmed by the granting of the application. Thus, the balance of the equities weighs in favor of the denial of the application. Lastly, the public interest would not be served by the granting of a preliminary injunction in this case. Therefore, because Tiny Love and Maya have failed to demonstrate that all four factors favor granting the preliminary injunction, and in fact, none of the factors favor granting such relief, Tiny Love and Maya's application is denied.